UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CRAIG WILSON, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:22-cv-11105-IT |
| | * | |
| RECORDED FUTURE, INC., | * | |
| CHRISTOPHER AHLBERG, and SCOTT | * | |
| ALMEIDA, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM & ORDER

September 30, 2025

TALWANI, D.J.

Plaintiff Craig Wilson, Jr., brings this action against his former employer, Defendant Recorded Future, Inc. ("Recorded Future"), and two of its executives, Christopher Ahlberg and Scott Almeida. Wilson alleges that Recorded Future violated the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. ("ADEA"), and the Massachusetts Fair Employment Practices Law, M.G.L. c. 151B, § 4(1B) ("Chapter 151B"), by adversely affecting the terms and conditions of his employment and ultimately discharging him because of his age. He also asserts that Recorded Future violated the Virginia Wage Payment Act, Va. Code 40.1-29, and that all Defendants violated the Massachusetts Wage Act, M.G.L. c. 149, § 148. He further asserts various common law claims against Recorded Future. See Am. Compl. ¶¶ 100–39 [Doc. No. 12].

Pending before the court is Defendants' Motion for Summary Judgment [Doc. No. 48]. For the reasons explained below, the Motion is DENIED as to Plaintiff's ADEA claim and otherwise GRANTED, except as to the wrongful termination claim, which Plaintiff has voluntarily dismissed.

I.      **Factual Record Viewed in the Light Most Favorable to Wilson**

      **A.  Recorded Future**

Recorded Future is a software-as-a-service company selling threat intelligence software and related services. Pl.'s Response to Def.'s Statement of Undisputed Material Facts and Add'l Material Disputed Facts ("PSOF") ¶ 2 [Doc. No. 56]. It is headquartered in Massachusetts and maintains offices in Massachusetts, Virginia, Singapore, Sweden, Japan, the United Arab Emirates, and England. Id. ¶¶ 6–7. Defendant Christopher Ahlberg is its CEO, and Defendant Scott Almeida is its CFO and Treasurer; both are based in Massachusetts. Id. ¶ 1. Recorded Future's compensation plans were drafted by the Vice President of Global Sales Operations, Ex. 111, Chronert Dep. 63:1–21 [Doc. No. 70-1]; Ex. 110, Almeida Dep. 44:4–24 [Doc. No. 55-36], but the record does not show where he was based.

Recorded Future was acquired by Insight Venture Partners on July 3, 2019, with RF Parent, Inc. ("RF Parent") taking over as Recorded Future's ultimate parent. PSOF ¶¶ 10–11 [Doc. No. 56]. Discussions about this acquisition began approximately three months prior to the acquisition closing. Ex. 109, Ahlberg Dep. 30:23–31:16 [Doc. No. 55-35].

      **B.  Wilson's Hiring, Stock Options, and Work Location**

Wilson began working for Recorded Future as an account executive in 2019, when he was 42 years old. PSOF ¶¶ 1, 29–30 [Doc. No. 56]. At that time, he had approximately two decades of experience in the federal civil accounts sector, including sales and management. Ex. 76, Wilson Interrogatory Answers ("Interrog. Ans.") 20 [Doc. No. 55-2]. He signed his Offer Letter from Recorded Future on May 30, 2019, prior to the announcement of the acquisition, and started working for Recorded Future on June 10, 2019, after the announcement. Ex. 1, Wilson Dep. 57:8–19 [Doc. No. 49-1]; PSOF ¶ 29 [Doc. No. 56].

Wilson was a resident of Virginia at the time he was hired and throughout his employment with Recorded Future. PSOF ¶¶ 14-15 [Doc. No. 56]. Wilson traveled to Massachusetts twice during his tenure with Recorded Future: for onboarding training at the Massachusetts office in July 2019, and for business in October 2019. Id. ¶¶ 48–49. He otherwise worked for Recorded Future from Virginia, commuting to Recorded Future's Virginia office a few times per week through March 2020, and then working primarily from his home in Virginia. Id. ¶¶ 41–43.

Wilson's Offer Letter provides, among other things: "Subject to approval by the Company's Board of Directors, you will be granted a stock option exercisable for 7,500 of the Company's Common Stock at the fair market value per share on the date of grant." Id. ¶ 56. The Offer Letter also states that it "supersede[s] and replace[s] any prior agreements, representations or understandings (whether written, oral, implied or otherwise) between you and the Company and constitute[s] the complete agreement between you and the Company[.]" Id. ¶ 27.

After the acquisition was announced, Wilson asked the recruiter if stock options "would still be at the same strike price and the number of options. She assured [him] verbally that they would be." Ex. 1, Wilson Dep. 56:22–57:3 [Doc. No. 49-1]; see also id. at 57:24–58:5 ("I remember just being reassured . . . that everything would be honored. I don't remember much beyond that."); Ex. 94 at RF0002250 (October 24, 2019, Email from Wilson to HR) [Doc. No. 55-20] ("I was told that my extended options and strike price would be considered pre-acquisition").

Recorded Future's Board of Directors did not approve the grant of 7,500 stock options; instead, on October 19, 2019, RF Parent's Board of Directors approved a grant of only 4,000 stock options. PSOF ¶¶ 59–60 [Doc. No. 56]. Wilson learned of this reduced grant of stock

options on October 24, 2019, and objected at the time. See Ex. 94 at RF0002250 (Email from Wilson to HR) [Doc. No. 55-20].

Pursuant to Wilson's Offer Letter, Wilson was eligible for commission payments beyond his base salary; such payments were "predicated upon [his] signing the Company's standard Sales Compensation Plan document." PSOF ¶ 23 [Doc. No. 56]. The plan documents specify commission rates and quotas for new and upsell ("N&U") accounts and renewals, as applicable. See Ex. 28, 2019 Sales Compensation Plan 4 [Doc. No. 49-28]; Ex. 29, 2020 Sales Compensation Plan 4 [Doc. No. 49-29].

### C.  The Public Sector Team Under Roger Coelho

Wilson was hired by and reported to Roger Coelho, who was based in Virginia, was older than Wilson, and with whom Wilson "had a pretty good working relationship." PSOF ¶ 1 [Doc. No. 56]; Ex. 112, Coelho Dep. 58:14–60:11 [Doc. No. 55-38].

In August 2019, Wilson executed his 2019 Sales Compensation Plan, which established a N&U quota of $535,000 and no renewal quota. PSOF ¶¶ 61, 63–64 [Doc. No. 56]. The plan did not specify Wilson's sales territory. Id. ¶ 65.

Wilson attended Public Sector Team meetings, which Coelho led between Wilson's date of hire and October 1, 2020. Id. ¶¶ 52–53. When Wilson started with Recorded Future, the Public Sector Team consisted of Coelho, Julie Starnes, and several others, all of whom were based in Virginia. Id. ¶¶ 1, 54.

In January 2020, Wilson received a performance review in which Coelho described him as "an ideal employee . . . doing everything correctly as it relates to pipeline generation and working the opportunities. He is also a great culture fit for the team." Ex. 84, 2019 Performance Review 2 [Doc. No. 55-10]. Coelho recalled no concerns about Wilson's job performance,

including with respect to "churn," and could not recall hearing concerns from others about Wilson's churn. Ex. 112, Coelho Dep. 82:8–83:15 [Doc. No. 55-38].[1] According to a colleague with whom Wilson worked daily, Wilson "had a reputation with the sales organization generally, and the public sector team specifically, for being a stellar account executive with strong numbers and excellent attention to detail." Ex. 81, Williams Decl. ¶¶ 6, 12 [Doc. No. 55-7]; see also Ex. 79, Williamson Decl. ¶ 5 [Doc. No. 55-5] (another colleague observing Wilson "was regularly and readily available and working throughout, before and after, working hours" and "worked long hours, and even late at night as needed"); Ex. 78, Bednar Dep. 232:3–24 [Doc. No. 55-4] (another colleague describing him as "single-handedly the most detail oriented presenter that I had seen in a very, very long time" and "[h]e knew the accounts, what was needed to be done. He would document step by step on all the stuff.").

Julie Starnes is 15 years younger than Wilson and had been working for Recorded Future for four years when Wilson started. PSOF ¶ 1 [Doc. No. 56]; Ex. 11 at RF0173381 (chart of hire and termination dates) [Doc. No. 49-11]. In January 2020, Starnes was promoted from account executive to leader of the Department of Defense and Intelligence Community ("DOD/IC" or "DOD-IC") Team. PSOF ¶ 76 [Doc. No. 56]. Coelho "brought [Starnes] up" to be a small-team leader for the DOD-IC. Ex. 33, Coelho Dep. 83:21–84:6 [Doc. No. 49-33]. At that point, Starnes was 28 years old. See PSOF ¶ 1 [Doc. No. 56].

A few months prior to Starnes' promotion, a 52-year-old account executive on the Public Sector Team was terminated. See Ex. 11 at RF0173381 (chart of hire and termination dates) [Doc. No. 49-11]; PSOF ¶ 1 [Doc. No. 56]. Recorded Future's undated employee handbook,

---

[1] "Churn" refers to the expiration of a customer's existing contract without a renewal. PSOF ¶ 72 [Doc. No. 56].

which the jury could infer was in effect at the time of this termination (and through August 2021), did not include age as a protected class in its "Anti-Discrimination Policy." Ex. 83, Futurist Handbook 9 [Doc. No. 55-9]. At some point after that termination, Starnes joked to Wilson that "if [that employee] was going to sue for age discrimination, 'He should have asked for more than 3 weeks of severance and he should have at least made it worth his while[.]'" Ex. 76, Interrog. Ans. 20 [Doc. No. 55-2].[2] Wilson also heard Starnes refer to older male employees as "lazy" or "storytellers," and in a conference with multiple team members, she made a reference to Wilson making "Dad Jokes." Ex. 75, Wilson Dep. 130:15–131:9 [Doc. No. 55-1]; Ex. 76, Wilson Interrog. Ans. 20–22 [Doc. No. 55-2]. By contrast, in her deposition she repeatedly described certain younger employees as "high energy." Ex. 113, Starnes Dep. 55:10–21, 82:22–83:5, 144:14–145:9 [Doc. No. 70-2].

When Wilson was hired, he was responsible for covering roughly half of Recorded Future's "Federal Civilian" sales territory. PSOF ¶ 32 [Doc. No. 56]. In February 2020, Wilson executed his 2020 Sales Compensation Plan, which established an N&U quota of $1,250,000 and a renewal quota of $1,042,000. Id. ¶¶ 66–68. In April 2020, the account executive who had been servicing the other half of the Federal Civilian sales territory left Recorded Future, resulting in Wilson inheriting his sales territory. Id. ¶¶ 83–84.

In October 2020, Coelho was terminated. Id. ¶¶ 88. Chief Revenue Officer Todd Chronert considered Wilson, among others for the position, and viewed Wilson as having the qualities Chronert was looking for, "maturity, acumen, presence, leadership, communication, subject matter expertise[,]" without anything about his leadership that Chronert would consider a

---

[2] The court does not consider facts drawn from that former employee's settlement letter, which Defendants object to under Fed. R. Evid. 408. See Defs.' Reply 5 [Doc. No. 5].

detriment although, as to attitude, Chronert "didn't necessarily feel that Craig was always a positive individual." Ex. 111, Chronert Dep. 37:19–38:14 [Doc. No. 70-1]. Wilson mentioned his interest in the position and had significant management experience in addition to his success in sales, but Recorded Future's leadership did not have conversations with him about the opportunity. Ex. 75, Wilson Dep. 122:19–123:4 [Doc. No. 55-1]. There was no application process for the promotion to that position. Id. at 116:20–117:2.

Instead, Starnes was promoted to fill Coelho's position, reporting to Chronert. PSOF ¶¶ 91, 97 [Doc. No. 56]. Chronert told Wilson that Chronert and CEO Ahlberg would mentor Starnes. Ex. 75, Wilson Dep. 117:6–23 [Doc. No. 55-1]. After Starnes' promotion, the Public Sector Team consisted of Starnes as leader, Wilson as account executive servicing the entire Federal Civilian sales territory, and two others (ages 29 and 35) servicing the DOD/IC sales territory. PSOF ¶¶ 1, 96 [Doc. No. 56].

In 2020, Wilson received an award as "the top ARR [annual recurring revenue] salesperson" for selling $2 million, which was "more dollars than anyone else" eligible for the award. Ex. 111, Chronert Dep. 89:19–90:13 [Doc. No. 70-1].[3] He also exceeded quota expectations by attaining 220% of his new & upsell ("N&U") quota and 292% of his renewal quota for that year. Ex. 92A, Commission Statement at ECF p.3 [Doc. No. 55-18].

### D.  Changes After Starnes' Promotion

#### 1.  2020: Discussion of Changes to Wilson's Territory

On October 6, 2020, the day after Starnes's promotion to fill Coelho's position, Wilson was informed of Starnes's intention to split his territory due to "an open headcount." Although it

---

[3] Starnes sold $5.5 million but was not eligible for the award due to the timing of her promotion. Id. at 90:11–25.

was Starnes' view that Wilson was effectively covering particular accounts and would be compensated for that work, Starnes expected to assign those accounts to other employees as the team expanded. Ex. 9, Starnes Dep. 71:13–72:16 [Doc. No. 70-2]. Starnes provided Wilson with an opportunity to influence which Federal Civilian accounts he would retain following the restructuring. PSOF ¶ 103 [Doc. No. 56].

On October 6, 2020, for example, Wilson emailed Starnes a "Territory Spreadsheet" dividing the Federal Civilian Territory between himself and two others listed as "TBD." Ex. 40 at RF0005224–25 [Doc. No. 49-40]. On December 3, 2020, Starnes emailed a "CivilianTerritories" spreadsheet to Wilson with the question, "Are we good with this list?" and Wilson responded, "I'm good with this.....and thank you for checking." Ex. 42 at RF0022187 [Doc. No. 49-42].

### 2. Additions to the Composition of the Public Sector Team

Between December 2020 and February 2021, two new hires (aged 33 and 37) and two transfers from other teams (aged 30 and 33) were added to the Public Sector Team. PSOF ¶¶ 1, 116–17, 121–22 [Doc. No. 56].

### 3. Changes to Wilson's Quotas

In January 2021, Starnes established the 2021 sales quotas for the Public Sector Team. Id. ¶¶ 123, 129–31. As compared with the 2020 Plan, under Wilson's 2021 Sales Compensation Plan ("2021 Plan"), his N&U quota increased from $1.25 million to $1.95 million and his renewal quota increased from $1 million to $4.5 million; his renewal commission rate went down from 7.2% to 1.7% and his N&U commission rate went down from 6% to 3.97%. Compare Ex. 29, 2020 Sales Compensation Plan 4 [Doc. No. 49-29], with Ex. 49, 2021 Sales Compensation Plan 4 [Doc. No. 49-49]; see PSOF ¶¶ 156–58 [Doc. No. 56]. Wilson emailed

Chronert and Starnes: "In my professional career I have never received a more insulting comp plan." Ex. 46 at RF0018241 [Doc. No. 49-46]; <u>see also</u> Ex. 7, Chronert Dep. 85:19–24, 86:23–87:1, 87:10–16 [Doc. No. 70-1] (Wilson took issue with increase in N&U quota and decrease in rates).[4]

After speaking with Wilson over the phone about these frustrations, Chronert offered Wilson a "make-bonus" (<u>i.e.</u>, "Hit your number, and I'll pay you.") of $20,000 if he achieved his N&U quota and $10,000 if he achieved his renewal quota. Ex. 7, Chronert Dep. 83:8–25 [Doc. No. 70-1]; PSOF ¶¶ 151–52 [Doc. No. 56]. Wilson was the first to be offered this make-bonus in 2021 but such bonuses later became a standard for sales compensation plans. Ex. 7, Chronert Dep. 92:7–93:1 [Doc. No. 70-1]; PSOF ¶ 154 [Doc. No. 56]. The make-bonus amounts were incorporated into Wilson's 2021 Plan, which he executed on March 9, 2021. PSOF ¶¶ 155, 158 [Doc. No. 56].

A month later, on April 16, 2021, Starnes informed Wilson by email of changes to the sales territories he would be covering "as part of the revamping of the Civilian territories" together with the onboarding of new account executives. PSOF ¶¶ 164–65 [Doc. No. 56]. Wilson replied, copying Chronert: "So only 3 Accounts? . . . And to be clear, no adjustment to my new

---

[4] Other account executives on the Public Sector Team were also frustrated with their 2021 sales compensation plans, PSOF ¶¶ 159–60 [Doc. No. 56], and also saw their 2021 N&U quotas increased over 2020, <u>see id.</u> ¶ 161 (Matthew Bednar: increase from $900,000 to $1.15 million); <u>id.</u> ¶ 162 (Andrew Chilcoat: increase from $820,000 to $1.15 million); <u>id.</u> ¶ 163 and Ex. 90C at RF0173374 [Doc. No. 55-16] (Christopher Kash: increase from $600,000 to $1.95 million). Their commission rates also decreased: Bednar's renewal commission rate decreased from 3.8% to 2.41% and N&U commission rate decreased from 8.56% to 7.3%; Chilcoat's renewal commission rate decreased from 5.8% to 4.43% and N&U commission rate decreased from 8.54% to 6.7%; and although Kash's commission renewal rate increased from 1.93% to 2.4154%, his N&U commission rate decreased from 7.92% to 3.94%. <u>Compare</u> Ex. 90, 2020 Sales Compensation Plans [Doc. No. 55-16], <u>with</u> Ex. 91, 2021 Sales Compensation Plans [Doc. No. 55-17]. None was assigned a lower commission rate on renewals than Wilson.

business quota? This is an adjustment being made just weeks after signing my 2021 comp plan? This is truly insane! . . I am now being told just weeks after signing my comp plan that my territory is being cut Dramatically!" Ex. 51 at RF0018945 [Doc. No. 49-51].

Wilson followed up by email to Starnes and Chronert on May 4 seeking further clarity on the impact of the territory change, including as to the accounts in his territory, his quota, the impact on his proposed compensation plan, and whether he "would get to close everything in [his] pipeline through the end of the year with no splits[.]" Ex. 54 at RF0019268 [Doc. No. 49-54]. On May 10, Starnes replied with a list of 83 accounts that would remain in his sales territory following the transition, PSOF ¶ 173 [Doc. No. 56], and informed him that a certain percentage of his current pipeline resided in certain accounts and that he would receive commission splits for 81 qualified opportunities, Ex. 54 at RF0019267–68 [Doc. No. 49-54].[5]

On May 13, Wilson emailed Starnes:

Not only is my normal comp now harder to achieve, but with 75% less addressable territory, it is frustrating that no concessions were made on quota or this [make-bonus]. It's a double whammy. I have spent the first 5+ months of my year focused on developing relationships with customers and partners that will no longer benefit me in my new territory. . . . I have opportunities I have worked over a year on that have literally vanished. Upsell opportunities I have been working on that were very promising are gone as well. Trying to play catch up 3 months before the Civilian buying season will be a challenge.

Ex. 55 at RF0019299 [Doc. No. 49-55].

---

[5] Dan Goldstein, a 27-year-old who joined the group in May 2021, received all commissions on certain accounts transferred to him from Wilson, and Wilson received no commissions on these accounts. See PSOF ¶¶ 1, 182 [Doc. No. 56]; Ex. 82A, Gorton Report 3 [Doc. 55-8] (identifying transferred accounts). Compare Ex. 93D, Goldstein Commission Statement at ECF pp. 11–12 [Doc. No. 55-19], with Ex. 93J, Wilson Commission Statement at ECF pp. 31–32 [Doc. No. 55-19].

On June 26, a DocuSign request was sent to Wilson with an addendum, dated May 1, 2021, adjusting Wilson's renewal quota down from $4.5 million to $3.94 million. Ex. 57 at RF0132787 (DocuSign request) [Doc. No. 49-57]. Compare Ex. 49 at RF0018595 (2021 Plan) [Doc. No. 49-49], with Ex. 56 at CW-000084 (unexecuted addendum) [Doc. No. 49-56]. The record does not show that the addendum was ever executed.

### E.  Wilson's Performance in 2021

Several of Wilson's 2020 accounts were not renewed in 2021.

Wilson closed USG#2[6] in 2020. Ex. 121 at RF0016667 ("Win Flash" Email) [Doc. No. 55-47]; PSOF ¶ 186 [Doc. No. 56]. Wilson and Recorded Future's leadership understood this to be an "unusual" deal related to the 2020 presidential election and thus of a type that "typically means that they don't come back[.]" Ex. 109, Ahlberg Dep. 82:3–83:4 [Doc. No. 55-35]; see also Ex. 114, Solomon Dep. 117:20–118:3 [Doc. No. 55-40] ("the likelihood that it could continue as annual recurring revenue is extremely low"). The deal's non-renewal impacted Wilson's quota for eligible renewals; had it been designated as a one-time deal rather than an ARR deal that could be renewed, it would have been part of Wilson's 2020 N&U quota instead. PSOF ¶¶ 190–92 [Doc. No. 56]. Wilson did not designate this or any other deal as either a recurring or one-time deal and was never told that he could re-designate deals within Recorded Future's systems. Ex. 119, Craig Wilson Decl. ¶ 2 [Doc. No. 55-45].

An account that Wilson was covering for someone else, USG#1, also was not renewed. See Ex. 9, Starnes Dep. 262:13–263:11 [Doc. No. 70-2]. At some point between December 2020 and May 2021, the account was pulled from Wilson, and Starnes "made it very known that she

---

[6] In accordance with the court's Electronic Order [Doc. No. 47], the parties have used "USG#" to refer to specific accounts. See Def.'s Mem. 5 n.1 [Doc. No. 50].

was covering it until we find a replacement." Ex. 78, Bednar Dep. 255:25–256:19 [Doc. No. 55-4]; <u>see</u> <u>id</u>. at 256:3–11 (recalling account was pulled from Wilson around the time Goldstein and Crivelli joined); PSOF ¶¶ 110, 182 (Crivelli joined in December 2020 and Goldstein joined in May 2021). Starnes "took command of it and didn't service the account, didn't speak to them. It was pulled from Craig. It wasn't his account anymore. No one was covering it." Ex. 78, Bednar Dep. 297:16–22 [Doc. No. 55-4]. Starnes nonetheless attributed the account's churn to Wilson because "[h]e is the account executive[.]" Ex. 113, Starnes Dep. 265:18–266:4 [Doc. No. 70-2].

Another account, USG#13, also was not renewed. This non-renewal was because of issues raised by the client relating to disability access for one of its employees and deficiencies in Recorded Future's software with regard to such access, which Recorded Future committed to addressing "by the end of 2022." Ex. 115, Donahoe Dep. 137:8–147:7 [Doc. No. 55-41].

 For another account, USG#3, Wilson moved the opportunity "into commit for the current quarter" and set a close date of March 26, 2021, but the deal did not close until June 3, 2021. PSOF ¶¶ 193, 196 [Doc. No. 56]. The delay in its closing "had to do with circumstances outside of Recorded Future's (and [Wilson's]) control. Specifically, there was in issue internal to [USG#3] concerning the procurement vehicle for the deal . . . due to its own internal workings." Ex. 81, Williams Decl. ¶ 17 [Doc. No. 55-7]. Ahlberg tracked this particular deal closely and "would have preferred that it arrive on the commit date." Ex. 7, Chronert Dep. 125:22–126:19 [Doc. No. 70-1].

In a June 2021 email, Chronert congratulated Wilson on "absolutely annihilating [his] Q2 sales objective" and described him as being "in position A going into the big Federal spend quarter[.]" Ex. 98 at RF0019548 [Doc. No. 55-24]. He explained that Wilson's sales had to be "close to the best single quarterly performance in company history." <u>Id.</u> Ahlberg responded to

12

Chronert's email, writing, "amazing" and "Dude. Bananas." Id. Almeida responded to the email, writing, "Incredible – well done and consistently well done!" Id. Wilson's closing of USG#3 for more than $900,000 "made it one of the largest accounts to date in the public sector group, if not in the sales organization as a whole." Ex. 81, Williams Decl. ¶ 18 [Doc. No. 55-7].

On September 30, 2021, Wilson hit his N&U quota for 2021. Ex. 93J, Commission Statement at ECF p.2 [Doc. No. 55-19]. He also achieved $3.3 million in renewals before his termination—roughly 73% of his quota pursuant to the 2021 Plan or 85% of his quota pursuant to the unexecuted addendum reducing his quota. See id.; Ex. 49 at RF0018595 (2021 Plan) [Doc. No. 49-49]; Ex. 56 at CW-000084 (unexecuted addendum) [Doc. No. 49-56]. The $3.3 million figure exceeded that of all other account executives in the Public Sector Team for all of 2021. Compare Exs. 93A–93I, Commission Statements [Doc. No. 55-19]. As of September 30, Wilson's combined attainment of both quotas in Q3 2021 was superior to all but one of the other account executives on the Public Sector Team. See Ex. 89, 2021 Global Quota Attainment Spreadsheet 3 (cells AI:85–94) [Doc. No. 55-89].

### F.  Performance Improvement Plans for Other Public Sector Team Members

Recorded Future's undated employee handbook provides that if "for any reason your performance deteriorates or your behavior becomes unacceptable and this cannot be resolved through informal discussion," Recorded Future "may" take the following steps outlined in its Disciplinary Procedure: (1) verbal warning, (2) written warning, (3) "final written warning and/or a performance improvement plan," and (4) dismissal. Ex. 83, Undated Futurist Handbook 10–11 [Doc. No. 55-9]. However, "[d]epending on the severity of the misconduct, or the deterioration of performance, the Company reserves the right to proceed immediately to a final written warning, or immediate termination of employment and benefits." Id. The handbook also

outlines the general structure of Performance Improvement Plans ("PIP"), which are remedial in nature. Id. The version of the handbook updated in August 2021 provides substantially similar guidance. See Ex. 129, August 2021 Futurist Handbook 10 [Doc. No. 60-6].

Starnes considered terminating or looking into remedial performance improvement plans ("PIP") for seven individuals, including Wilson. Ex. 113, Starnes Dep. 350:10–20 [Doc. No.70-2].

In April or May 2021, Starnes placed Andrew Chilcoat on a PIP. Id. at 350:10–11; Ex. 88, Chilcoat PIP [Doc. No. 55-14]. Chilcoat was 33 years old at the time. PSOF ¶ 1 [Doc. No. 56]. Chilcoat failed to close any deal in Q1 2021 on time and was "only forecasting 70%" of his N&U quota for Q2 2021. Ex. 88, Chilcoat PIP [Doc. No. 55-14]. In Q3 2021, he attained 1.71% of his N&U quota. Ex. 89, 2021 Global Quota Attainment Spreadsheet 3 (cell AI:85) [Doc. No. 55-15]. He nevertheless remained employed with Recorded Future until he voluntarily left in July 2022. Ex. 11 at RF0173381 (chart of hire and termination dates) [Doc. No. 49-11]. Starnes thought it was worthwhile putting him on a PIP because "[h]e is a more junior rep, and [she] felt that he had demonstrated behaviors that could be improved upon." Ex. 113, Starnes Dep. 351:19–352:2 [Doc. No. 70-2]. She "wanted to retain him on the team, and [she] wanted to see him improve." Id. at 169:3–6.

Starnes was also looking at the performance of Dan Goldstein "after two inadequate quarters." Ex. 113, Starnes Dep. 350:12–13 [Doc. No. 70-2]. Goldstein is 18 years younger than Wilson. PSOF ¶ 1 [Doc. No. 56]. He attained only 3.1% of his N&U quota for 2021. Ex. 89, 2021 Global Quota Attainment Spreadsheet 4 (cell BA:88) [Doc. No. 55-15]. Starnes was "disappointed by certain engagements with Mr. Goldstein in . . . the way he conducted his professional behavior. . . . He was just readily frustrated when things did not go his way. . . . [H]e

14

would have strong vocal outbursts . . . He rose his voice." Ex. 113, Starnes Dep. 86:9–87:14 [Doc. No. 70-2]. She had "weekly one-on-ones" with Goldstein to help him with his job performance. Id. at 96:6–11. He remained with Recorded Future until the spring of 2022, when he left voluntarily. Id. at 95:17–96:5; Ex. 11 at RF0173381 (chart of hire and termination dates) [Doc. No. 49-11].

Starnes did not put Wilson on a PIP. At her deposition, she explained that she did not do so because "[i]t was just my personal opinion that based on engagements and lack thereof, that it was not worthwhile to go through the exercise of putting him on" such a plan. Ex. 113, Starnes Dep. 350:21–351:9 [Doc. No. 70-2].

### G. Wilson's Termination

Starnes and Chronert first discussed terminating Wilson between March and June 2021 because in Starnes' view, Wilson was not meeting the expectations "of a seasoned seller." Ex. 113, Starnes Dep. 335:12–337:3 [Doc. No. 70-2]. In the course of approximately three conversations with Chronert, she "did nothing" to document or address any concerns about Wilson's performance. Id. at 337:18–338:3. Treasa Law, the Director of Human Resources, had no recollection of any plan or suggestion in place that Wilson might be terminated or that any intervention or discipline was planned. Ex. 118, Law Dep. 62:5–64:14 [Doc. No. 55-44].

Either Starnes, with Chronert's approval, or Starnes and Chronert together, made the decision to terminate Wilson's employment. Ex. 113, Starnes Dep. 316:15–17 [Doc. No. 70-2] (testifying that she, "with Todd Chronert," made the decision to terminate Wilson's employment); Ex. 111, Chronert Dep. 218:8–10 [Doc. No. 70-1] (testifying that Starnes made the decision to terminate Wilson). Either way, Chronert provided his approval for the termination, and had the authority to block Wilson's termination but did not do so. PSOF ¶¶ 221,

223–24 [Doc. No. 56]. Stu Solomon, the President and Chief Operating Officer based in North Carolina and to whom Chronert reported, also had the power to block Wilson's termination but did not do so. Id. ¶¶ 1, 93, 226. Ahlberg and Almeida were informed of the decision to terminate Wilson before it was communicated to him. Id. ¶¶ 229, 231. Treasa Law, the Director of Human Resources based in Massachusetts, assisted Starnes in facilitating the termination process, but did not make the decision to terminate Wilson. Id. ¶¶ 1, 232–33.

Starnes represented to Human Resources in preparation for Wilson's termination that Wilson had churned over $1 million in business, equating to "roughly 20% of his renewal book of business[.]" Ex. 66 at RF0028180 [Doc. No. 49-66]. In calculating this high churn percentage, she also represented that his "Q3 Renewal Quota" was $3.6 million, see id.,[7] when his renewal quota set forth in his 2021 Sales Compensation Plan was $4.5 million and the renewal quota set forth in the unexecuted May 2021 addendum was $3.94 million. See Ex. 49 at RF0018595 (2021 Plan) [Doc. No. 49-49]; Ex. 56 at CW-000084 (unexecuted addendum) [Doc. No. 49-56].

Recorded Futures communicated its decision to terminate Wilson's employment on October 1, 2021. PSOF ¶ 218 [Doc. No. 56]. This was one day after he attained his N&U quota for 2021. See Ex. 93J, Commission Statement at ECF p.2 [Doc. No. 55-19]. He received nothing in writing as to the reason for his termination; instead, Starnes and Law held a termination meeting with Wilson over Zoom, during which Starnes "thanked [Wilson] for his efforts and his time at Recorded Future, but [said] that we were planning to do a reorganization and eliminate

---

[7] Wilson asserts that this figure represents his renewal quota for all of 2021, not just for Q3. See Pl.'s Statement of Add'l Material Disputed Facts ¶ 388 [Doc. No. 56]; Opp. 7 [Doc. No. 54]. Defendants have not challenged the assertion.

his role. And through that, I appreciated everything that he had done." Ex. 113, Starnes Dep. 371:6–13 [Doc. No. 70-2].

Starnes provided differing reasons for the termination. At her deposition, she testified that she terminated Wilson because of "the reorganization of the team and the restructuring," but also because of "team behavior, and lack of team morale and participation, and the renewals churning[.]" Ex. 9, Starnes Dep. 3539–17 [Doc. No. 70-2]; see also id. at 316:3–12, 316:20– 317:11 (concerns about churn and "lack of execution as it relates to renewals"). Chronert reported in his deposition that the reasons for terminating Wilson included "performance, protesting of decisions, lack of detail, failure at performance on renewals, [and] missed commitments." Ex. 7, Chronert Dep. 218:11–20 [Doc. No. 70-1].

As to attitude, Starnes testified that Wilson "was not proving to be a good team player and distracting from team meetings and team morale." Ex. 9, Starnes Dep. 317:1–11 [Doc. No. 70-2]. She questioned his commitment and noted her "lack of ability to get in touch with [Wilson] throughout the day." Id. at 317:12–17. Chronert testified that he also witnessed a "negative" and "immature" attitude by Wilson on team calls, in the sense that he put up "too much protest" and the way "he presented [disagreement] should have been more professional." Ex. 7, Chronert Dep. 220:23–222:18 [Doc. No. 70-1]. Charlie Williamson, who worked closely with Wilson, said he heard differing explanations from Starnes about why Wilson was terminated: first that it was due to "an 'attitude' issue," and several months later that it was "because [Wilson] was more interested in his real estate license than his job for Recorded Future." Ex. 79, Williamson Decl. ¶ 9 [Doc. No. 55-5].

### H.  Post-Termination Payments

From October 5–19, 2025, Wilson corresponded with Treasa Law in Human Resources because "there were a couple of discrepancies [he] was supposed to discuss with [Starnes] the day [he] was terminated." Ex. 106 at RF0028496 (Oct. 5, 2021 email) [Doc. No. 55-32]. After going back and forth about personnel files and calculations of Wilson's commissions and make-bonus, Wilson wrote on October 18, "I noticed my commissions and bonus were not included in the payment on [October] 15th." Id. at RF0028493 (Oct. 18, 2021 email). Law responded the next day: "I connected with Finance today and it seems there was a misunderstanding on processing. They are finalizing the commission / bonus amount today and will cut a check ASAP (this week) which will also be a direct deposit into your account." Id. (Oct. 19, 2021 email).

As to one of his commission payments, Wilson also told Law that USG#4A "is a new customer and the total sale was $81,600[.] I am not sure why but the ARR is showing up as $34,608 when it should be the full amount $81,600[.]" Id. at RF0028495 (Oct. 10, 2021 email). Law wrote back that "$46,992 of this deal was counted as renewal ARR to offset the churn on the [USG#4] renewal. The remainder was counted as upsell." Id. at RF0028494 (Oct. 14, 2021 email). Chronert explained in his deposition that "if a customer 'churns,' whether it's a full license or partial license . . . we lose that money, obviously. . . ." Ex. 7, Chronert Dep. 184:24–185:2 [Doc. No. 70-1]; see also PSOF ¶ 72 [Doc. No. 56] (churn occurs when a customer's existing contract expires without a renewal). Chronert stated further that "[i]f we're able to win that back, whatever portion we had lost, the new order counts against that. So we call that 'reverse churn.'" Ex. 7, Chronert Dep. 185:4–6 [Doc. No. 70-1]. Reverse churn is applied to an account executive's renewal quota. Id. at 185:19–22; Ex. 9, Starnes Dep. 334:14–22 [Doc. No. 70-2]. "[R]everse churn is only for 365 days from expiring or churn date." Ex. 7, Chronert Dep.

186:11–12 [Doc. No. 70-1]. If a seller is able to bring a customer back after 366 days, "then that would actually be considered a new logo." Id. at 186:2–9.

### I.   Post-Termination Changes to the Public Sector Team

Following Wilson's separation from Recorded Future, Starnes restructured the Federal Civilian sales territory. PSOF ¶ 268 [Doc. No. 56].

### II.   Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Baker v. St. Paul Travelers, Inc., 670 F.3d 119, 125 (1st Cir. 2012). A dispute is genuine if a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This burden can be satisfied in two ways: (1) by submitting affirmative evidence that negates an essential element of the non-moving party's claim or (2) by demonstrating that the non-moving party failed to establish an essential element of its claim. Id. at 323–25.

Once the moving party establishes the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of material fact remains. Id. at 324. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of [the] pleadings." Anderson, 477 U.S. at 248. Rather, the non-moving party must "go beyond the pleadings and by

[his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). Disputes over facts "that are irrelevant or unnecessary" will not preclude summary judgment. Anderson, 477 U.S. at 248.

When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . ." Anderson, 477 U.S. at 255.

## III.    Discussion

### A.  Age Discrimination Claims (Counts I–II)

#### 1.  Age Discrimination Under the ADEA (Count I)

Under the ADEA, courts apply a three-step burden-shifting framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973); see also Yee v. Massachusetts State Police, 481 Mass. 290, 294, 121 N.E.3d 155 (2019) (applying McDonnell Douglas framework to claim brought under M.G.L. c. 151B). First, a plaintiff must establish a prima facie case of age discrimination: "(i) at the relevant time the plaintiff was a member of the protected class; (ii) the plaintiff was qualified for the job; (iii) the plaintiff suffered an adverse employment action; and (iv) the adverse employment action occurred under circumstances giving rise to an inference of discrimination, such as the fact that the plaintiff was replaced by someone 'substantially younger.'" Rinsky v. Cushman & Wakefield, Inc., 918 F.3d 8, 29 (1st Cir. 2019). Second, if the plaintiff meets this burden, a presumption of discrimination arises, and the burden shifts to the

defendant to rebut the presumption by articulating a legitimate, non-discriminatory reason for the adverse employment action. See McDonnell Douglas, 411 U.S. at 802; Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000). Third, "with the initial presumption of discrimination removed, it falls upon the employee to 'present sufficient evidence to show both that the employer's articulated reason ... is a pretext and that the true reason is discriminatory. . . . Plaintiffs may use the same evidence to support both conclusions[.]" Santiago-Ramos, 217 F.3d at 54 (internal quotation marks and citation omitted).

Recorded Future does not contest the existence of a prima facie case for purposes of its motion, see Defs.' Mem. 8 n.2 [Doc. No. 50], and articulates the following non-discriminatory reasons for the termination of Wilson's employment: "(i) Wilson churned more than $1 million of business; (ii) Wilson displayed a poor attitude; (iii) Wilson exhibited a poor work ethic; and (iv) the Company expected Wilson would continue to impede its attempts to restructure the Federal Civilian sales territory." Id. at 8–9.

The court finds that Wilson has met his evidentiary burden of showing that a jury could find each of these reasons was pretextual. As to sales performance generally, a jury could find based on the record before the court that Wilson had an outstanding track record of success exceeding quota expectations, winning awards for his performance, and achieving a percentage of his quota either on par with or superior to that of most of his peers both in 2020 and 2021. A jury may find that the company's asserted loss due to Wilson's churn is pretextual in light of the fact that he sold $3.3 million in renewals for 2021 at the time of his termination, which was more than any other account executive on the Public Sector Team. As to churn specifically, Wilson has presented sufficient evidence to establish a material dispute as to how that was calculated. He has shown that his actual renewal quota changed at least twice, and that Starnes represented to

HR in preparation for Wilson's termination a figure of his achieved quota that was inconsistent with the record evidence. He has also shown that his responsibility for the non-renewal of at least two accounts, which contribute to the calculation for his eligible renewals and therefore his churn, is a disputed material fact. See Ex. 109, Ahlberg Dep. 82:3–83:4 [Doc. No. 55-35] (acknowledging USG#2 was an "unusual" deal related to the 2020 presidential election and thus of a type that "typically means that they don't come back"); Ex. 78, Bednar Dep. 297:16–22 [Doc. No. 55-4] (USG#1 churned because "it wasn't assigned to a rep" and "[Starnes] took command of it and didn't service the account"). Furthermore, a jury could reasonably find pretext from the absence of evidence that he was put on notice of any deficiencies with churn prior to his termination.

As to attitude and work ethic, Wilson has shown that the criticisms raised against him are contradicted by the speakers themselves, see, e.g., Ex. 111, Chronert Dep. 37:19–38:14 [Doc. No. 70-1] (Chronert testifying Wilson had the qualities of "maturity, acumen, presence, leadership, communication, subject matter expertise" that he sought in a leader), as well as by company leadership and colleagues who have worked closely with Wilson. Wilson has also shown that Starnes took disparate approaches with younger account executives on her team who displayed performance or attitude issues, such as Chilcoat and Goldstein, including placing them on a PIP rather than firing them, and that age may have been a factor in those approaches. Moreover, not only was Wilson not placed on a performance improvement plan, there is no record that he was ever counseled or warned about his attitude or work ethic. Finally, Wilson has shown a material dispute underlying the criticisms of specific accounts, such as the delay in closing USG#3 due to the client's internal operations and the non-renewal of USG#13 due to disability access issues Recorded Future did not commit to resolving in time.

As to restructuring, Recorded Future's explanation ultimately circles back toward attitude, where Starnes "believed Wilson would not be amenable to the Company's plans to restructure the Federal Civilian sales territory." Defs.' Mem. 13 [Doc. No. 50]. The only evidence proffered is that, "in April 2021, Wilson sent an unprofessional e-mail to Starnes and Chronert expressing his protest with the Company's decision." Id. A jury could reasonably find that both the need to restructure and the belief that Wilson would impede that restructuring are pretextual where, as discussed above, there are disputed issues of fact as to Wilson's performance as he covered the open sales territory, and disputed issues of fact as to perceptions of Wilson's attitude in the company.

Moreover, Wilson has put forth evidence from which a jury could reasonably find age bias: Starnes joked about a former employee's complaint of age discrimination, described older employees as "lazy" and "storytellers" while describing younger employees as "high energy,"[8] and disparately treated employees' performance and attitude issues, including by offering younger employees, but not Wilson, performance improvement plans rather than termination.

Accordingly, the court finds Wilson has met his burden at step three of the McDonnell Douglas framework. Recorded Future's motion for summary judgment on Count I, the ADEA claim is DENIED.

---

[8] Recorded Future argues on reply that the "high energy" comments are "isolated references" made in Starnes' deposition two years after the termination and thus have no temporal or causal connection to the decision at issue here, citing caselaw that "stray comments" standing alone are insufficient to meet the plaintiff's burden. See Reply 7–8 [Doc. No. 61]. But the "high energy" remarks do not stand alone here, and a jury could reasonably consider them with the other evidence in the record.

## 2.    Age Discrimination Under Chapter 151B (Count II)

The parties dispute whether Massachusetts law applies to Wilson's allegations of age discrimination given that he worked principally from Virginia. Chapter 151B provides in relevant part that "an employer in the private sector" cannot "because of the age of any individual, . . . bar or [] discharge from employment [an] individual, or [] discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification." M.G.L. c. 151B, § 4(1B). Chapter 151B must be "construed liberally for the accomplishment of its purposes." Id. § 9.

In determining if venue was proper, the Supreme Judicial Court of Massachusetts has held that it "do[es] not read G.L. c. 151B so narrowly as to mean that conduct constituting an unlawful termination can occur in only one place." Cormier v. Pezrow New England, Inc., 437 Mass. 302, 306, 771 N.E.2d 158 (2002). "Such a confining interpretation would be inconsistent with the realities of today's employment world." Id. As the court explained, "[a]n unlawful employment practice may consist of many actions and decisions made far from where the employee is physically located, between company officials who themselves are separated by great distances, and may be implemented in one of many jurisdictions." Id. An unlawful employment practice may occur where the employee receives notice of his termination, where the decision was made, or where "'the core of the employment relationship' lies." Id. at 307. Based on Cormier, courts "have applied 151B in situations where the employment decisions at issue were made in Massachusetts, though their effects were felt in another state." Turnley v. Banc of America Investment Services, Inc., 576 F.Supp.2d 204, 219 (D. Mass. 2008).

The employment decision at issue is Wilson's termination. Wilson does not dispute that he was in Virginia when he received notice of his termination, but does dispute where the

decision was made. He contends that there is a "discrepancy in testimony about who made the decision[,]" Opp. 21 [Doc. No. 54], but the only discrepancy is that either Starnes made the decision "with Todd Chronert," <u>see</u> Ex. 113, Starnes Dep. 316:15–17 [Doc. No. 70-2], or Starnes made the decision alone, <u>see</u> Ex. 111, Chronert Dep. 218:8–10 [Doc. No. 70-1]. In either event, Wilson admits that Chronert provided his approval for the termination. PSOF ¶ 221 [Doc. No. 56]. Wilson also admits that Stu Solomon, Chronert's direct supervisor, had the power to block Wilson's termination but did not do so. <u>Id.</u> ¶¶ 93, 226. Neither Starnes, Chronert, nor Solomon, were based in Massachusetts, <u>see id.</u> ¶ 1, and so their role in the termination does not implicate Chapter 151B. Nor does the role of Treasa Law, the Director of Human Resources based in Massachusetts, who Wilson admits assisted Starnes in <u>facilitating</u> the termination process but did not make the termination <u>decision</u>. <u>Id.</u> ¶¶ 1, 232–33.

Wilson suggests that a jury could find that Ahlberg and Almeida, the CEO/President and CFO/Treasurer who were both based in Massachusetts, had something to do with his termination based on the fact that he interacted with them both on a daily or near-daily basis and their taking an interest in Wilson's work. <u>See</u> Opp. 21 [Doc. No. 54]. But Ahlberg testified to only "vaguely" recalling that someone brought the termination to his attention sometime prior to Wilson being told, and that he could not remember having any "emotional reaction" to the news. Ex. 109, Ahlberg Dep. 108:20–110:15 [Doc. No. 55-35]. And Almeida similarly testified that, based on a search of records, he had been informed by someone that Wilson's employment was being terminated, but he had no recollection of the details. Ex. 124, Almeida Dep. 146:16–148:22 [Doc. No. 60-1]. Where Wilson has presented no evidence that Ahlberg or Almeida made the decision in whole or part to terminate him, and where the termination decision was made or ratified by three levels of intermediate supervisors (Starnes, Chronert, Solomon) between Wilson

and Ahlberg and Almeida, a jury could not reasonably infer, based only on Wilson having frequent contact with them and Ahlberg and Almeida being informed in advance, that Ahlberg or Almeida participated in the decision to terminate Wilson's employment.

Finally, Wilson has not met his burden of showing that the "core of the employment relationship" as relevant to the discriminatory action complained of was in Massachusetts. Although Recorded Future's headquarters was in Massachusetts and Wilson was recruited from there with an offer letter signed by Ahlberg, and commission plans were drafted and administered in Massachusetts, Wilson worked, together with the rest of the Public Sector Team, entirely from the Virginia (other than two trips to Massachusetts in 2019), under three levels of supervisors not based in Massachusetts. PSOF ¶¶ 1, 41–43, 48–49 [Doc. No. 56]. As such, the core of the employment relationship for purposes of Chapter 151B was not in Massachusetts.

Accordingly, the court finds that Chapter 151B does not apply to Wilson's age discrimination claims, and summary judgment is granted as to Count II.

### B. Counts III–IV: Wage Claims

Counts III and IV claim violations of the Massachusetts Wage Act and the Virginia Wage Payment Act, respectively.

As an initial matter, Defendants argue they are entitled to summary judgment on the Massachusetts Wage Act claim because Massachusetts does not have the most significant relationship to Wilson's employment. Defs.' Mem. 21 [Doc. No. 50]. Plaintiff contends that the court need not make a choice-of-law determination as to the wage claim until trial. Opp. 23 [Doc. No. 54]. The court need not reach the choice-of-law question as to the wage claims at all because, as explained below, Wilson fails to meet his burden on summary judgment as to these claims under either state's laws.

Wilson's claims are principally focused on his commission for the USG#4A account, a portion of which Recorded Future treated as a renewal to offset churn and the remainder of which was treated as an N&U deal. Wilson contends that "the jury is entitled to find that this was inappropriate and contrary to policy [as] they were separate accounts." Opp. 22 [Doc. No. 54] (citing PSOF ¶ 257). Wilson's only explanations of why he views this as contrary to policy are found in an email he sent to Treasa Law of Human Resources stating that the customer in question "is a new customer[,]" Ex. 106 at RF0028495 (Oct. 10, 2021 email) [Doc. 55-32], and his interrogatory response and expert's report contending that it was a "new contract," Ex. 70, Wilson Third Supp. Interrog. Ans. 3 [Doc. No. 49-70]; Ex. 82A, Gorton Report 3 [Doc. 55-8]. But Wilson has offered no further support that USG#4A in fact involved a "new customer" (rather than a different bureau of an existing or former customer) or that a new contract or account related to an existing or former customer should not be counted as a renewal under Recorded Future's policies.[9]

Wilson separately contends that HR "admitted to errors in Wilson's wages, resulting in late payments after Plaintiff's termination date." Opp. 22 [Doc. No. 54]. However, any claim for damages for late payment has been waived, where Wilson was asked to identify the sources of his claimed damages and how they were computed, and made no mention of damages for late payment of wages. See Ex. 70, Wilson Third Supplemental Interrog. Ans. No. 5 [Doc. No. 49-

---

[9] Wilson's citations to excerpts from the depositions of Starnes and Chronert only support the general proposition that "reverse churn" is reflected on an account executive's quota as renewal "[i]f it was part of their renewal bucket" and, if not, then as "new and upsell[.]" Ex. 9, Starnes Dep. 334:8–22 [Doc. No. 70-2]; see also Ex. 7, Chronert Dep. 185:19–22 [Doc. No. 70-1] (reverse churn "would go towards the renewal quota").

70] (identifying, <u>inter alia</u>, unpaid wages and treble damages on the unpaid wages, under the Massachusetts Wage Act, but not mentioning damages for late payment of wages).

Accordingly, Recorded Future's Motion for Summary Judgment is GRANTED as to the wage claims (Counts III–IV).

### C. Count V: Breach of Contract

Count V, Wilson's breach of contract claim, is based on Recorded Future's alleged withholding of "promised compensation as described herein," which "included commissions and stock options." Am. Compl. ¶¶ 125, 127 [Doc. No. 12].

The parties agree that that under both Virginia and Massachusetts law, a failure to pay an employee's complete wages is a breach of contract. <u>See</u> Defs.' Mem. 23 [Doc. No. 50]; Opp. 25 [Doc. No. 54]. Where "parties concede that the approach to interpreting [a] Contract would be the same under either legal regime" and when the resolution of such an issue "would not alter the disposition of a legal question, a reviewing court need not decide which body of law controls." <u>Okmyansky v. Herbalife Int'l of Am., Inc.</u>, 415 F.3d 154, 158 (1st Cir. 2005).

As discussed above, Wilson has presented no evidence from which a jury could infer that the USG#4A account should have been treated differently.

Defendants contend that Delaware law applies to the claim regarding the stock options, and point out that, under the Offer Letter, the grant of stock options was "[s]<u>ubject to approval by the Company's Board of Directors.</u>" PSOF ¶ 56 [Doc. No. 56] (emphasis added); Ex. 2 at RF0028771 (Offer Letter) [Doc. No. 49-2]. In response, Wilson does not defend his breach of contract claim based on the stock options in his Offer Letter. <u>See</u> Opp. 25 [Doc. No. 54] (arguing stock options claim based solely on "the duty of good faith and fair dealing"); <u>see also</u> Reply 15 [Doc. No. 61].

Accordingly, Recorded Future's Motion for Summary Judgment is GRANTED as to the breach of contract claim (Count V).

### D. Count VI: Breach of Duty of Good Faith and Fair Dealing

Count VI is a claim for breach of the duty of good faith and fair dealing and asserts that "Recorded Future unlawfully and in bad faith impaired or destroyed the right of Mr. Wilson to receive the fruits of [his employment] contract, including without limitation, by continually contracting Mr. Wilson's sales territory and expanding his quota in a manner that unfairly deprived Mr. Wilson of earned commissions for work he performed, and by terminating Mr. Wilson's employment so as to avoid paying Plaintiff commissions and permitting his stock options to vest." Am. Compl. ¶ 130 [Doc. No. 12]. Viewing this as a claim under Fortune v. National Cash Register Co., 364 N.E.2d 1251 (Mass. 1977), Defendants contend that Massachusetts law does not apply and that, in any event, Wilson cannot establish a Fortune claim. Defs.' Mem. 26-28 [Doc. No. 50]. In opposition, Wilson asserts that the court need not conduct a choice-of-law analysis and that under either Massachusetts or Delaware law, "where Plaintiff relied on Recorded Future's promise of 7,500 stock options in leaving his better-paying job, the duty of good faith and fair dealing prohibited Recorded Future from misrepresenting that [Recorded Future] would fulfill [its] promise." Opp. 25 [Doc. No. 54]. Wilson rests his argument entirely on his assertion that "Wilson reached out to Recorded Future's internal recruiter in Massachusetts to ask about what would happen to the stock options promised in his offer letter in light of the acquisition" and, in response, the "recruiter assured Wilson that the Company's promises concerning issuance of stock options, including that he would receive 7,500 options at the agreed-upon strike price, would be honored in its entirety." Pl.'s Statement of Add'l Material Disputed Facts ¶¶ 286, 288 [Doc. No. 56].

Defendants respond that Wilson did not plead a claim for misrepresentation in the Amended Complaint. Reply 15 [Doc. No. 61]. The court agrees. Although Wilson did allege in the underlying facts that he relied on Recorded Future's offer of 7,500 shares to leave "an otherwise higher-paying position" with another employer, and that the "bait-and-switch with respect to Mr. Wilson's stock options was the first of many times that the Company promised Plaintiff one thing for his (diligent) work, and instead paid him less than had been represented[,]" Am. Compl. ¶¶ 27–30 [Doc. No. 12], the specific cause of action at issue is not for detrimental reliance or intentional misrepresentation, but a claim that Record Future took actions to deprive him of contract rights in breach of its duty of good faith and fair dealing.

The only action taken to deprive him of stock options he expected to receive was the Board of Directors' vote. But critically, as Wilson acknowledges, the May 30, 2019, Offer Letter provides: "Subject to approval by the Company's Board of Directors, you will be granted a stock option exercisable for 7,500 of the Company's Common Stock at the fair market value per share on the date of the grant." PSOF ¶ 56 [Doc. No. 56] (emphasis added); Ex. 2 at RF0028771 (Offer Letter) [Doc. No. 49-2]. Recorded Future's promise of 7,500 stock options was thus conditioned on approval by the Board of Directors. Wilson admits that neither the Board of Directors for Recorded Future nor the Board of Directors for RF Parent approved the grant of 7,500 stock options. PSOF ¶¶ 59 [Doc. No. 56]. To the extent Wilson was assured that "everything would be honored" in the Offer Letter, it was: subject to the express conditions stated on the face of the letter.

Moreover, to the extent Wilson suggests his conversation with the recruiter removed that condition precedent, it would be unenforceable under Delaware law. Under the internal affairs doctrine, Delaware law applies here "because stock option plans are considered matters

pertaining to the internal affairs of a corporation[,]" and "[t]he state with authority over a corporation's internal affairs is the state of incorporation." Mariasch v. Gillette Co., 521 F.3d 68, 72 (1st Cir. 2008) (citing Harrison v. NetCentric Corp., 433 Mass. 465, 744 N.E.2d 622 (Mass. 2001)). Both Recorded Future and RF Parent were incorporated in Delaware at the relevant times. PSOF ¶¶ 9, 12 [Doc. No. 56]. Under Delaware law, a "bilateral oral agreement creat[ing] a 'right' to require the corporation to issue stock to the plaintiff within the meaning of Section 157 of the Delaware General Corporation Law, . . . is invalid under that section for lack of board approval and a writing." Grimes v. Alteon, Inc., 804 A.2d 256, 258 (Del. 2002). Wilson cites no authority to the contrary. The cases on which Wilson relies are inapposite here because they involve a misrepresentation concerning the duration of an employee's position, see Merrill v. Crothall-Am., Inc., 606 A.2d 96, 102 (Del. 1992) ("a rational jury could infer that Crothall never intended that Merrill stay in the position longer than was necessary to secure a suitable replacement"), or a board concealing its actions in breach of its fiduciary duties, see In re Tyson Foods, Inc., 2007 WL 2351071, at *4 (Del. Ch. Aug. 15, 2007) (intentionally and deceptively channeling corporate profits to chosen executives "suggests a scheme inherently beyond the bounds of business judgment").

Accordingly, Recorded Future's Motion for Summary Judgment is GRANTED as to Count VI, the breach of duty of good faith and fair dealing claim.

### E.  Count VII: Wrongful Termination

Count VII, Wilson's wrongful termination claim, is voluntarily dismissed. See Opp. 9 [Doc. No. 54].

### F. Count VIII: Quantum Meruit

Wilson's quantum meruit claim "is pleaded as an alternative to Wilson's contract claims . . . in the event that the finder of fact holds that there was no enforceable contract requiring that . . . all 7,500 stock options be awarded[.]" Opp. 29 [Doc. No. 54]. However, the agreement between the parties—that Wilson would provide services in exchange for, among other things, stock options subject to Board approval—was subject to a written contract. The quantum meruit claim is therefore unavailable to him under either Virginia or Massachusetts law. See Morris v. Taylor Commc'ns Secure & Customer Sols., Inc., 513 F. Supp. 3d 694, 702 (W.D. Va. 2021), aff'd, 2023 WL 34267 (4th Cir. Jan. 4, 2023) ("implied contract actions such as quantum meruit and unjust enrichment are unavailable when an express contract governs the dispute's subject matter"); see also Guldseth v. Fam. Med. Assocs. LLC, 45 F.4th 526, 541 (1st Cir. 2022) ("A plaintiff is not entitled to recovery on an unjust-enrichment or quantum-meruit theory where there is a valid contract that covers the same subject matter and defines the obligations of the parties.").

Accordingly, Recorded Future's Motion for Summary Judgment is GRANTED as to Count VIII, the quantum meruit claim.

### IV. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. No. 48] is GRANTED as to Counts II–VI and VIII, and DENIED as to Count I. As noted above, Count VII is voluntarily dismissed.

IT IS SO ORDERED.

September 30, 2025                              /s/ Indira Talwani
                                               United States District Judge